IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| BENITA MAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 12-2184-STA-dkv |
| | ) | |
| UNITED OF OMAHA LIFE INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT ON THE
ADMINISTRATIVE RECORD
ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE
ADMINISTRATIVE RECORD

Before the Court is Plaintiff Benita May's ("May") Motion for Judgment on the

Administrative Record (D.E. # 16) filed September 14, 2012. Defendant United of Omaha Life

Insurance Company ("UOO") filed a Motion to Deny May's Requested Relief and to Affirm

United of Omaha Life Insurance Company's Decision to Deny Benefits (D.E. # 20) on October

29, 2012, which the Court construes as a response and cross-motion for judgment on the

administrative record. May filed a Reply and Response (D.E. # 26) to UOO's Response and

Cross-motion on November 21, 2012. For the reasons stated herein, the Court **DENIES** May's

Motion and **GRANTS** UOO's Cross-motion.

<u>**BACKGROUND**</u>[1]

**A. Events leading to May's Application for Short-term Disability**

The parties agree in substance on the facts leading to May's application for disability coverage. May suffered a cardiac arrest on December 13, 2008. (A.R. at 294). While receiving treatment in the emergency room, May experienced a seizure. (*Id.* at 295). The West Houston Medical Center diagnosed May as having received anoxic brain injuries as a result of her cardiac arrest. (*Id.* at 302). On January 8, 2009, May was able to return to Memphis from Houston, and began receiving treatment from Healthsouth Rehabilitation Hospital. (*Id.* at 295). Healthsouth Rehabilitation Hospital discharged May on January 15, 2009. (*Id.* at 284).

Hollis & Burns, Inc. employed May as a Commercial Lines Account Manager.[2] (*Id.* at 350). On her return to work in March of 2009, May experienced some difficulties managing her book of business. (*Id.* at 352) After several work-related issues, May told Hollis & Burns that September 24, 2009 would be her last day of work and applied for short-term disability benefits through UOO. (*Id.* at 350-52).

**B. Policy Terms**

At all relevant times, Hollis & Burns, Inc. maintained a group short-term disability policy and a group long-term disability policy through UOO that covered May. (*Id.* at 67-166). The short-term disability policy provided "[i]f, while insured under this provision, You become

---

[1] In the interest of simplicity, the Court's citations to the Administrative Record ("AR") will be to ECF page ID numbers instead of the Court's usual practice of citation to Docket Entry number and docket entry page number.

[2] The Court notes UOO objects to the Court's consideration May's affidavit of November 28, 2011 as part of the administrative record, as UOO made their decision to deny before receipt of this affidavit. The Court will address this objection below. However, the Court does not believe this portion of its recitation of facts is in dispute.

Disabled due to Injury or Sickness, We will pay the Weekly Benefit shown in the Schedule." *Id.* at 97. The short-term disability policy further stated:

> Disability and Disabled means that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which You are:
>
>> Prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and
>>
>> Unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.

(*Id.* at 81.) The short-term disability policy defines "Sickness" as "a disease, disorder or condition, including pregnancy, for which you are under the care of a Physician." (*Id.* at 109.) The short-term disability policy defines "Injury" as

> an accidental bodily injury which is the direct result of a sudden, unexpected and unintended external force or element, such as a blow or fall, that requires treatment by a Physician. It must be independent of Sickness or any other cause, including, but not limited to, complications from medical care.

(*Id.* at 108).

Under the terms of the short-term disability policy, UOO would no longer pay benefits on the occurrence of any one of several events, including: "the day You are no longer Disabled . . . . the day You fail to provide Us satisfactory proof of continuous Disability, and/or any Current Earnings . . . . the day You are not under Regular Care for the Injury or Sickness that Caused the Disability[.]" (*Id.* at 97-98.) The short-term disability policy defines "Regular Care" as "(a) You visit a Physician as frequently as is medically required, according to standard medical practice, to effectively manage and treat Your disabling condition; and (b) You receive Appropriate Care and Treatment." (*Id*. at 109).

### C. History of Treatment and Diagnosis

Dr. J. Felix Martinez, M.D. ("Dr. Martinez") began treating May for the effects of her cardiac arrest on January 21, 2009. (*Id.* at 616-18). Over the course of two years and five months, Dr. Martinez saw May nine times. (*Id.* at 444-51, 605-06, 611-12, 614-18, 702). During May's first visit, Dr. Martinez noted May "seem[ed] to have some problems with memory nowadays." (*Id.* at 616). When Dr. Martinez saw May on September 1, 2010, she complained of "a daily struggle with her job-related duties" and "significant problems maintaining concentration and learning new aspects of her job. (*Id.* at 450). Dr. Martinez described these as "typical cognitive deficits that can be ascribed to a post-anoxic static encephalopathy." (*Id.* at 451). Dr. Martinez referred May for a full neuropathic evaluation. (*Id.*)

Pursuant to this referral, on November 23, 2010, Dr. Keith Atkins ("Dr. Atkins") performed a neuropsychological evaluation on May (the "Atkins Report"). (*Id.* at 544). As part of this evaluation, Dr. Atkins administered a Wechsler Adult Intelligence Scale-IV test, on which May "earned a low average to average Full Scale IQ of 89." (*Id.* at 547). In particular, Dr. Atkins found that although May's performance was average for perceptual reasoning, her performance was "just below average with a scaled score of 7 on Matrix Reasoning," a measure of "nonverbal abstract problem-solving. (*Id.* at 548). May's performance was also below average on "Digit Span," but Dr. Atkins determined May's variable effort was responsible for this score. (*Id.*)

Also as part of the neuropsychological evaluation, Dr. Atkins performed two effort tests. (*Id.* at 547). Dr. Atkins found that Mays' effort was "well below expectation on five of the seven measures" of the effort tests." (*Id.*) Dr. Atkins noted that, as a result, May's neuropsychological tests "likely underestimate[d] her actual memory and cognitive function." (*Id.*) As a result, Dr. Atkins found May's cognitive and memory function consistent with pre-morbidity functioning

and that there was no evidence of cognitive deficit. (*Id.* at 549). Dr. Atkins also determined May likely suffered from depression and anxiety, and that treatment of any depression and anxiety would require "medical counseling, psychotherapy, and … psychotropic medication." (*Id.* at 636).

However, on March 15, 2011, Dr. Martinez disagreed with Dr. Atkins' evaluation, stating "even though [May's] scores fell within normal limits, they do not represent or are consistent with her estimated premorbid functioning" and that he "believe[d] that she has had a discreet [*sic*] amount of decrease in her cognitive function[.]" (*Id.* at 446). At this time, Dr. Martinez determined May was unable to return to work at Hollis & Burns due to her cardiac arrest. (*Id.* at 446-47). Dr. Martinez referred May to Dr. Connie Paul, M.D., for another battery of neuropsychological evaluations (the "Paul Report"). (*Id.* at 489).

Dr. Paul conducted a neuropsychological evaluation over three days: April 8, 2011; April 28, 2011; and May 11, 2011. (*Id.*) Dr. Paul found the results of this evaluation "most similar to the test findings of December 2010."[3] (*Id.* at 491). However, Dr. Paul disagreed with Dr. Atkins findings regarding effort, stating May "appeared motivated to extend her best effort" and "the present test results appear to represent a valid measure of her current functioning." (*Id.*) Dr. Paul found May to be "presently functioning within the Low Average range of general intelligence and Low Average to Borderline Impaired range of memory." (*Id.* at 493). Dr. Paul further stated that because of May's prior employment, May would have previously tested in the "Bright Normal range[,]" and that testing in the Low Average ranges represented a decline in cognitive and memory function. (*Id.*) Again contradicting Dr. Atkins, Dr. Paul stated "[t]his

---

[3] It appears this is a reference to the testing performed by Atkins, as Atkins dated his summary of his findings December 2, 2010.

finding does not appear to be secondary to poor effort in light of the consistency on retesting and her performance on other assessments of effort."  (*Id.*)

On or before June 17, 2011, Dr. Carl M. Da Cunha, M.D., ("Dr. Da Cunha") signed a statement that May had permanent memory problems stemming from the hypoxic event connected to her cardiac arrest.[4]  (*Id.* at 525).  Dr. Da Cunha issued a letter on October 31, 2011, stating May had problems multi-tasking and opining May would not be able to return to her prior level of functioning due to her problems with anxiety, concentration, and information processing. (*Id.* at 358).

UOO requested May visit a third psychiatrist for neurophysiological testing.  Dr. Brad L. Roper, Ph.D, ABPP, ("Dr. Roper") evaluated May on August 18, 2011 and August 20, 2011 (the "Roper Report").  (*Id.* at 393).  Dr. Roper subjected May to the same battery of tests as Dr. Atkins.  (*Id.*)  Dr. Roper's findings were substantially similar to Dr. Atkins and Dr. Paul's with respect to May's cognition and memory.  (*Id.* at 393-405).  For example, Dr. Roper found that May's cognitive mental status was below expectations for her age and that her overall intellectual abilities were in the low average range.  (*Id.* at 400).  Dr. Roper also noted May's memory assessment scores were "borderline to average."  (*Id.* at 401).  However, like Dr. Atkins, Dr. Roper found that May's scores on effort tests showed that she "did not consistently put forth good effort."  (*Id.* at 400).  Because of May's variable effort, Dr. Roper noted her scores on this battery of tests "likely underestimate her abilities."  (*Id.*)  In particular, with respect to one component of May's memory assessment scores where May scored in the severely impaired range, Dr. Roper opined "poor effort" likely impacted her performance.  (*Id.* at 401).  Dr. Roper

---

[4] The Court is unable to determine the precise date of this statement, as the statement is not dated.  However, a fax header on the document indicates someone faxed it on June 17, 2011. The Court does not find the precise date of this statement material, and will assume Dr. Da Cahuna issued the statement on June 17, 2011.

stated in his formal assessment that "[i]n light of variable effort, it is not possible to establish the presence of a cognitive disorder." (*Id.* at 402).

## D. Claims Process

On October 8, 2010, UOO received May's Short Term Disability Claim Form. (*Id.* at 665-671). This Claim Form indicated a diagnosis of post-anoxic encephalopathy, a physical condition caused by deprivation of oxygen to the brain. (*Id.* at 670). As noted above, Dr. Martinez referred May to Dr. Atkins to confirm this diagnosis. UOO agreed to pay short term disability benefits to May through November 22, 2010. (*Id.* at 643). UOO informed May that, in order to extend disability payments past November 22, 2010, May would need to submit documentation verifying continuing disability. (*Id.*)

UOO received the results of Dr. Atkins' neuropsychological evaluation on December 6, 2010.[5] (*Id.* at 631-36). On December 7, 2010, after review of Dr. Atkins' report, UOO informed May that she would need to set up an appointment with a psychotherapist as soon as possible. (*Id.* at 221). On December 8, 2010, a psychiatrist, Dr. Morgan, informed UOO May had scheduled an appointment of February 25, 2011, which was Dr. Morgan's first available appointment. (*Id.* at 224).

On December 13, 2010, UOO's Nurse Case Manager reviewed the Atkins Report. (*Id.* at 728). The Nurse Case Manager determined that "[b]ased on review of the medical information, NCM is unable to support the medical restrictions and limitations from 11/23/201 forward" and asked that documentation regarding any psychiatric consultation be sent to UOO's Nervous and Mental Health Coordinator. (*Id.*)

---

[5] UOO states it received this document on December 7, 2010. However, the fax header on the document indicates December 6.

On December 16, 2010, UOO forwarded the Atkins Report to the Nervous and Mental Health Coordinator. (*Id.* at 723). The Nervous and Mental Health Coordinator completed a review of the Atkins Report on December 17, 2010. (*Id.* at 725). The Nervous and Mental Health Coordinator noted that May's inability to schedule an appointment with a psychotherapist for three months was not consistent with a severely impairing psychiatric decision. (*Id.*) The Nervous and Mental Health Coordinator determined there was not enough information in the file to find May "suffer[ed] from a psychiatric impairment that would preclude working." (*Id.*)

On December 22, 2010, UOO informed May by letter that UOO was denying short term disability benefits after November 23, 2010. (*Id.* at 624). UOO cited the lack of evidence of any cognitive deficit or impairment that would preclude May from working as the reason for its decision. *Id.* UOO noted in the letter that May had scheduled a psychiatric appointment for February 15, 2011, but stated that the documents before UOO did not support restrictions and limitations at that time. *Id.* at 625. UOO also told May she had the right to appeal this determination within 180 days of receipt of the letter and provided an address to send the appeal. *Id.*

May timely appealed UOO's decision on June 18, 2011. (*Id.* at 514-40). May attached the Paul Report, a letter from a neighbor, various e-mails between May and Hollis & Burns, and notes and a letter from Dr. Da Cunha to her appeal. On July 12, 2011, after review of the record, Dr. Timothy Tse, M.D., a UOO employee, noted "some discrepancy among the findings from Drs. Atkins and Paul[,]"and recommended an independent neuropsychological evaluation. (*Id.* at 732). On July 22, 2011, UOO notified May by letter that UOO requested her to undergo neuropsychological testing by Dr. Roper. (*Id.* at 420).

UOO reviewed the Roper Report on September 13, 2011.  (*Id.* at 736).  On review, the Nervous and Mental Health Coordinator noted Dr. Roper's determination that May's exhibited variable effort in cognitive testing and that Dr. Roper could not objectively establish May suffered from cognitive impairment.  (*Id.*) The Nervous and Mental Health Coordinator further noted that Dr. Roper was unable to find restrictions or limitations on May's ability to work.  (*Id.*) The Nervous and Mental Health Coordinator also found significant that Dr. Roper discussed the primary cause of May's difficulties at work as having stemmed from depression and anxiety, and that May's anxiety was largely resolved, leading to a determination that there were no clear limitations or restrictions on May's ability to work.  (*Id.*)

On September 15, 2011, UOO sent the Roper Report to May, informing her UOO would allow her to submit comments or additional documentation to supplement the record until September 30, 2011.  (*Id.* at 390).  In response to two requests by May, UOO extended this deadline to first November 11, 2011, (*Id.* at 380) then November 28, 2011.  (*Id.* at 377).  In the second letter granting an extension dated November 7, 2011, UOO stated it would make a decision "once we hear from your [attorney's] office, or on November 28, 2011, whichever occurs sooner."  (*Id.*)

On November 11, 2011, UOO received a faxed letter from May's attorney as well as a handwritten note from Dr. Da Cunha.  (*Id.* at 373-75).  Dr. Da Cunha's note stated May "will not be able to work at her prior level due to [a] combination of anxiety, problems with concentration and difficulty retaining information."  (*Id.* at 375).  The letter from May's attorney consisted of an argument in favor of granting May's appeal.  (*Id.* at 373-74).

On November 15, 2011, UOO denied May's appeal of UOO's initial decision to deny benefits.  (*Id.* at 366-71).  UOO gave an exhaustive list of the records it reviewed in coming to

this decision, including, in most pertinent part, Dr. Martinez' records; the Atkins Report; the Paul Report; and the Roper Report. (*Id.* at 366-67). UOO also considered Dr. Da Cunha's records and Dr. Da Cunha's handwritten notes. (*Id.* at 367). UOO further considered various other medical records not germane to the current discussion. (*Id.*) Based on these documents, UOO determined "the available medical records do not support restrictions or limitations from either a mental or physical condition which would prevent Benita May from working at her job[.]"

On November 28, 2011, May's attorney submitted a letter with an attached affidavit detailing May's struggles at her job, and conversations she had with supervisors at Hollis & Burns after her cardiac arrest. (*Id.* at 350-52). May's attorney also attached the e-mails between May and Hollis & Burns already included in May's appeal. (*Id.* at 353-355). On November 29, 2011, UOO informed May's attorney that UOO had conducted a "courtesy review" of the materials submitted on November 28, 2011, but that UOO's decision to deny May's appeal stood. (*Id.* at 346).

On March 6, 2012, May sued UOO in this Court, alleging UOO wrongfully denied her both short-term and long-term disability benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*. May then filed the instant motion on September 14, 2012, asking the Court for judgment on the administrative record overturning UOO's decision to deny short-term and long-term disability benefits, arguing UOO's denial of benefits was arbitrary and capricious. UOO responded on October 10, 2012, arguing that May had waived her claim to any long-term benefits by failure to exhaust and that UOO's decision to deny short-term disability benefits was based on substantial evidence and not arbitrary or capricious.

## STANDARD OF REVIEW

Because a district court must limit itself to the evidence before the plan administrator at the time of its decision, traditional summary judgment concepts are inapposite to adjudication of an ERISA action for denial of benefits under 29 U.S.C. § 1132(a)(1)(B).[6] A district court will normally review a plan administrator's denial of benefits *de novo*.[7] However, where a plan fiduciary has discretionary authority to determine eligibility for benefits or construe plan terms, a district court will review his decisions on an "arbitrary and capricious" standard.[8] The Sixth Circuit does not require "magic words" or "incantation" of the phrase "discretionary authority" to find the plan vests discretion in the plan administrator.[9] Rather, the reviewing court should focus on the plan administrator's "authority to determine eligibility for benefits or to construe the terms of the plan."[10] For a court to find an administrator has discretion warranting review under the arbitrary and capricious standard, the plan must contain "a clear grant of discretion [to the administrator] to determine benefits or interpret the plan."[11]

The arbitrary and capricious standard is "highly deferential"[12] It "is the least demanding form of judicial review of administrative action . . . . When it is possible to offer a reasoned

---

[6] *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 617-19 (6th Cir. 1998).

[7] *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 659-60 (6th Cir. 2004).

[8] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989); *Whitaker v. Hartford Life & Acc. Ins. Co.*, 404 F.3d 947, 949 (6th Cir. 2005).

[9] *Hoover v. Provident Life Ins. Co.*, 290 F.3d 801, 808 (6th Cir. 2002); *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 557 (6th Cir. 1998).

[10] *Firestone*, 489 U.S. at 115.

[11] *Perez*, 150 F.3d at 557.

[12] *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996).

explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious."[13]  "Thus, the standard requires that the decision 'be upheld if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence.'"[14] Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[15]  It is "not simply some evidence, or even a great deal of evidence.  Rather, the 'substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'"[16]  A reviewing court "may not focus and base [its] decision entirely on a single piece of evidence, and disregard other pertinent evidence."[17]

---

[13] *Perry v. United Food & Commercial Workers Dist. Unions 405 & 442*, 64 F.3d 238, 241 (6th Cir. 1995) (citations and internal quotation marks omitted).

[14] *Killian v. Healthsource Provident Administrators, Inc.*, 152 F.3d 514, 520 (6th Cir. 1996) (quoting *Baker v. United Mine Workers of America Health & Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)).

[15] *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

[16] *Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

[17] *Herphner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).

## ANALYSIS

May asks this Court to reverse UOO's decision to deny both long-term and short-term disability benefits as arbitrary and capricious. UOO responds that May's long-term disability benefits are not properly before the court, and that its decision to deny short-term disability benefits was the result of a deliberate and principled reasoning process based on substantial evidence in the record. The Court will address these issues in turn.

### Exhaustion

The Court finds May's failure to exhaust administrative remedies with respect to her long-term disability excusable under the doctrine of futility. A court must exercise its discretion to excuse non-exhaustion when resort to administrative procedures would "simply be futile."[18] "To meet the 'quite restricted' standard for establishing administrative futility, we have required a litigant to 'make a clear and positive indication' that further review would have come to naught."[19]

The operative short-term disability policy defines a Disability as

Disability and Disabled means that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which You are:

Prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and

Unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.[20]

The operative long-term disability policy states:

---

[18] *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 419 (6th Cir. 1998).

[19] *Dozier v. Sun Life Assur. Co. of Can.*, 466 F.3d 532, 535 (6th Cir. 2006) (quoting *Fallick*, 162 F3d at 419).

[20] *Id.* at 81.

Disability and Disabled means that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which You are:

> Prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and

> Unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.[21]

The only difference in the language is the substitution of the word "Occupation" for "Job" in the long-term disability policy. The policies, however, define "Regular Job" and "Regular Occupation" identically: "the occupation You are routinely performing when Your Disability begins."[22]

Noting that UOO determined there was insufficient evidence in the record to find May suffered from a disability as defined in the short-term disability policy, the Court finds it would have been futile for May to present a claim for long-term disability. Such a claim would have been unnecessarily duplicative for no discernible benefit.

## Denial of Benefits

Before beginning its analysis of UOO's decision to deny short-term disability benefits (and, by implication, long-term disability benefits,) the Court notes the parties agree an arbitrary and capricious standard should apply.[23] Both the long-term and short-term disability plans clearly delegate discretion to determine eligibility and construe policy terms to the plan administrator.[24] Therefore, the Court must determine only whether UOO's decision was the

---

[21] *Id.* at 131.

[22] *Id.* at 109, 165.

[23] Pl.'s Mem. in Sup't. at 13; Def.'s Brief in Sup't at 3.

[24] A.R. at 72, 118.

product of a deliberate principled reasoning process and whether there was substantial evidence in the record at the time of UOO's decision supporting a denial of benefits to May.[25]

The parties dispute what documents were properly before UOO at the time UOO made its decision to deny benefits. Specifically, UOO argues the affidavit May submitted on November 28, 2011, was not part of the record when UOO made its decision. May maintains that the Court should consider this affidavit as part of the record before UOO, as UOO had granted May an extension of time to comment and submit documents up to November 28, 2011.

The Court finds May's affidavit was not part of the record before UOO at the time it made the decision to deny May's appeal. May relies on UOO's purported extension and a statement from UOO that UOO made a "courtesy review" to show that UOO should have and did review May's affidavit. However, UOO did not grant May an unconditional extension to November 28, 2011. Rather, UOO stated "our appeal decision will be made *once we hear from your office*, or on November 28, 2011, *whichever occurs sooner*."[26] The Court cannot read this sentence in any way other than to cut off May's right to submit more documents as soon as UOO heard from May or her attorney. UOO "heard from" May's attorney on November 11, 2011, and proceeded to make its determination at that time. That UOO may have performed a "courtesy review" of documents submitted after that time has no bearing on whether those documents were before UOO at the time it made its determination.

Based on the record before UOO at the time of its determination, UOO's denial of short-term disability benefits was not arbitrary and capricious. The Court finds UOO engaged in a principled, deliberate reasoning process and based its decision on substantial evidence. Although

---

[25] *Killian*, 152 F.3d at 520.

[26] A.R. at 377 (emphasis added).

May makes several arguments that UOO did not engage in a deliberate and principled reasoning process, the Court finds these arguments without merit.

May first argues UOO's decision to deny benefits was arbitrary and capricious because UOO failed to consider whether May was prevented from performing at least one of the Material Duties of her Regular Job and unable to generate Current Earnings in excess of 99% of her Weekly Earnings as defined by the short-term disability policy. A failure to adequately consider prior occupational requirements in this context is arbitrary and capricious.[27] However, UOO considered May's occupational requirements in rendering its decision.

UOO primarily relied on the Atkins and Roper Reports in denying May's appeal. The record shows Dr. Atkins considered May's issues performing her job duties while determining whether May suffered from a cognitive deficit that preventer May returning to work.[28] Dr. Roper went into some detail in describing May's job duties:

> Prior to her entering disability status, she worked as a commercial lines account manager, managing approximately $2 million worth of policy premiums per year. She states that she managed from 90 to 100 different accounts. She reports that as an account manager she was responsible for everything related to each account. Before yearly renewal dates, she would have to put together proposals for the insurance coverage for the upcoming year, allowing the client to choose from several different insurers. She spent considerable time interacting with clients, such as in handling insurance claims and tracking information specific to each account. She reports that insurance companies receive bulletins regarding changing laws and implications for insurance.[29]

Dr. Roper then described May's reported issues performing her job duties.

---

[27] *Hunter v. Life Ins. Co. of N. Am.*, 437 Fed. App'x 372, 376 (6th Cir. 2011) (finding a failure by benefits administrator to consider actual physical requirements of a job arbitrary and capricious).

[28] A.R. at 633-34.

[29] *Id.* at 399-400.

The examinee reports various work difficulties following her return to work in 2009 after her heart attack. She states that she has difficulty remembering conversations. She had difficulty following up on tasks that were given to her verbally. She reports that she would be walking across the office and have several brief conversations. Then she would have difficulty remembering them when she got back to her desk. She reports some especially embarrassing events in which she forgot that people had died when speaking with clients . . . . She indicates difficulty handling multiple pieces of information in sequence. She indicates that she had difficulty learning new software programs and other procedures such as online insurance application forms provided by different companies . . . . She reports difficulty learning these new procedures such that she was unable to perform them independently . . . . She indicates that she would take the wrong car off of an insurance policy. She states that she had difficulty organizing information and making sure that she was performing the right actions on insurance accounts. She reports that her boss told her she was becoming a liability issue[.]

. . .

She also indicates difficulties learning new laws regarding insurance regulation that interfere with her ability to return to work.[30]

However, after considering May's job duties, her described symptoms, and the results of testing, Dr. Roper found "factors other than cognitive impairment [due to anoxic encephalopathy] contributed to [May] leaving work, most notably increasing anxiety on the job."[31]

Because UOO relied primarily on the Atkins and Roper Reports, both of which considered May's occupational requirements, the Court finds UOO adequately considered May's occupational requirements. Although May cites to two cases in which a district court found a failure by a plan administrator to consider specific job requirements arbitrary and capricious, in each case the plan administrator failed to consider the specific requirements of the job at all, or

---

[30] *Id.* at 395.

[31] *Id.* at 404.

relied solely on a report that failed to consider occupational requirements.[32]  That is not the case here.  Dr. Atkins gave at least some consideration to the specific requirements of May's occupation, and Dr. Roper gave significant consideration to May's job requirements.

May asserts UOO exhibited bias in its decision to credit Dr. Roper and Dr. Atkins over Dr. Da Cunha, Dr. Martinez, and Dr. Paul, apparently referencing the fact that UOO was both the plan administrator and the entity that would make payments under the short-term disability policy.  It is true that the Court must take  into account the "inherent conflict of interest" when a plan administrator both determines claim eligibility and would pay the claim, even under the highly deferential arbitrary and capricious standard.[33]  However, this conflict of interest becomes "less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy . . . by walling off claims administrators from those interested in firm finances."[34]  UOO introduces evidence it has indeed taken such steps by pointing out that Susan Feregrino, the author of UOO's denial of May's appeal, had no contact with company actuaries or financial personnel and had no information on how the handling of the claim might affect UOO's performance.[35]  As a result, the potential for bias in UOO's decision making becomes much less of a factor, and without more does not serve to show UOO acted in an arbitrary and capricious manner.

---

[32] *Rabuck v. Hartford Life & Acc. Ins. Co.*, 522 F. Supp. 2d 844, 877 (W.D. Mich. 2007); *Baker v. Metro. Life Ins. Co.*, No. 3:05-cv-262, 2006 WL 3782852, at *17 (M.D. Tenn. Dec. 20, 2006) ("The record is unclear if Dr. Ruder considered the actual and specific requirements of Baker's practice[.]").

[33] *Calvert v. Firststar Fin. Inc.*, 409 F.3d 286, 292 (6th Cir. 2005); *Borda v. Hardy, Lewis, Pollard & Page, P.C.*, 138 F.3d 1062, 1069 (6th Cir. 1998).

[34] *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008).

[35] A.R. at 370-71.

May next argues UOO "cherry picked" the administrative record. An administrator's explanation of a denial of benefits "must be consistent with the 'quantity and quality of the medical evidence' that is available on the record."[36] However, "[w]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious."[37]

The core of May's "cherry-picking" argument is that of the three neuropsychological examinations in the record, UOO chose to credit those of Dr. Roper and Dr. Atkins and not that of Dr. Paul. May also takes issue with the fact that UOO failed to credit the opinions of Dr. Martinez and Dr. Da Cunha. Although May contends the Paul Report and the notes submitted by Drs. Martinez and Da Cunha indicate May indeed suffered from a cognitive impairment, UOO was not under any obligation to credit these findings, or even explain why it chose to credit Drs. Roper and Atkins over Drs. Martinez, Da Cunha, and Paul. A plan administrator's decision to rely on one physician's report over another is generally not arbitrary and capricious, as the relied-upon report provides evidence for a reasoned explanation of the decision.[38] "[T]here is no discrete burden of explanation when [a plan administrator] credit[s] reliable evidence that conflicts with a treating physician's evaluation."[39] There is nothing before the Court that indicates either the Atkins or Roper Reports were unreliable, and UOO was free to credit these reports.

---

[36] *Moon v. Unum Provident Group*, 405 F.3d 373, 381 (6th Cir. 2005).

[37] *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989).

[38] *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 168 (6th Cir. 2003).

[39] *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

A review of the cases on which May relies shows UOO did not engage in the sort of "cherry-picking" the Sixth Circuit contemplated in holding that selective review of the administrative record was arbitrary and capricious. In *Spangler v. Lockheed Martin Energy Systems, Inc.*[40], the plan administrator relied on the report of a vocational consultant who never personally examined the claimant.[41] The plan administrator only sent one physician's report without the rest of the file (the vast majority of which contradicted the physician's report) to the vocational consultant for review.[42] The plan administrator then decided to rely solely on the vocational consultant's obviously-flawed report rather than the entire administrative record.[43] This reliance on an "inherently flawed" report was arbitrary and capricious.[44]

In *Metropolitan Life Ins. Co. v. Conger*, an insurer determined a claimant had answered a question on a coverage form incorrectly, and therefore denied coverage.[45] In doing so, the insurer found that the claimant suffered from a progressive neurological disorder at the time he filled out his application for insurance.[46] However, the claimant saw "multiple doctors, none of whom diagnosed him with any such disorder."[47] To reach its determination, the insurer "focused on slivers of information that *could be* read to support a denial of coverage and ignored—without

---

[40] *Spangler v. Lockeed Martin Energy Sys., Inc.*, 313 F.3d 356 (6th Cir. 2002).

[41] *Id.* at 362.

[42] *Id.* at 361.

[43] *Id.* at 362.

[44] *Id.*

[45] *Metro. Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007). It should be noted that *Conger* is not an ERISA case; it arose under the Long-Term Care Security Act.

[46] *Id.*

[47] *Id.*

explanation—a wealth of information that directly contradicted its basis for denying coverage."[48] This was not a "deliberate and principled" decision because of the overwhelming evidence supporting a contrary position.[49]

Finally, in *Moon v. Unum Provident Corp.*, the plan administrator terminated a claimant's long-term disability benefits on the basis of the recommendation of a doctor in the plan administrator's employ who never directly examined the claimant.[50]  This doctor based his recommendation on one exercise study performed by another doctor that was consistent with the claimant doing light work.  The doctor who performed the exercise study had also entered an opinion into the record that the claimant's hypertension was "not easy to control".[51] Furthermore, another doctor was the claimant's primary treating physician, and that doctor examined the claimant several times, coming to the conclusion the claimant was unable to work.[52]  In other words, the sole opinion that the claimant was able to work issued from a doctor employed by the plan administrator who never examined the claimant directly.  That doctor formed his opinion in reliance on the testing of another doctor, whose own opinion flatly contradicted the opinion of the plan administrator's doctor.  The Sixth Circuit found reliance on the opinion of the plan administrator's employee doctor irrational and unreasoned.[53]

---

[48] *Id.*

[49] *Id*.

[50] *Moon v. Unum Provident Corp.*, 405 F.3d 373, 381 (6th Cir. 2005)

[51] *Id.* at 376.

[52] *Id* at 382.

[53] *Id.*

In this case, UOO credited the opinions of two neuropsychologists who performed extensive direct testing on May. Further, one of those neuropsychologists, Dr. Roper, directly considered the contradictory findings of Dr. Paul, Dr. Da Cunha, and Dr. Martinez in his report.[54] Although Dr. Martinez, Dr. Da Cunha, and Dr. Paul's opinions disagree with those of Dr. Atkins and Dr. Roper, they do not constitute the sort of overwhelming evidence present in *Spangler*, *Moon*, or *Conger*. Neither do the opinions of Dr. Atkins and Dr. Roper constitute the "slivers" of evidence relied upon by the insurer and plan administrators of those cases. Instead, it appears UOO chose to rely on substantial evidence in the record in its decision to deny May short-term disability benefits. That other evidence was contradictory does not render UOO's decision arbitrary and capricious.

Finally, May argues UOO's decision was not the product of a principled and deliberate reasoning process because UOO did not consider the entire administrative record. May asserts UOO did not consider various e-mails attached to May's appeal letter of June 16, 2011. In support of this argument, May states that UOO conducted a courtesy review of these e-mails only, as indicated in UOO's letter of November 29, 2011.[55] The Court finds that UOO's letter dealt with the attachments to May's attempted supplementation of the record on November 28, 2011. May's counsel included these e-mails in the attempted supplementation of the record in addition to May attaching them to her appeal. As previously discussed, UOO was under no obligation to consider this attempted supplementation. It is not apparent that UOO's statement it conducted a courtesy review of the e-mails when included in the attempted supplementation means UOO did not consider the e-mails when attached to May's letter appealing UOO's initial

_____

[54] A.R. at 396-98, 402.

[55] *Id.* at 346.

denial of benefits; only that UOO gave them a courtesy review when attached to the attempted supplementation of the record.  Though UOO did not specifically mention the e-mails in its denial letter, UOO did state it reviewed May's letter to which May had attached the e-mails.[56] Further, the information contained in the e-mails brings nothing new to the record; the neuropsychologists upon whose opinions UOO relied were both aware May experienced difficulties at work and that May's employer had concerns about liability issues, and noted these issues in their reports.[57]  It appears to the Court that UOO had the information in these e-mails and considered this information in making its decision to deny May's appeal.

Because the Court finds May's arguments that UOO failed to consider May's occupational duties, and that UOO exhibited bias in choosing to credit the Roper and Atkins reports, that UOO "cherry-picked" the record or otherwise failed to consider relevant evidence in the record without merit, the Court **DENIES** May's Motion for Judgment on the Administrative Record.  The Court finds UOO's based their determination to deny benefits on substantial evidence and a deliberate, principled reasoning process.  As was their right, UOO chose to rely on the credible reports of two neuropsychologists, both of whom indicated May did not suffer from any physical or mental condition which precluded her from work.  UOO did not cherry-pick the record so as to ensure a favorable result, and May does not show that UOO's decision-making was biased.  The Court cannot find UOO's decision to be arbitrary and capricious. Therefore, the Court **GRANTS** UOO's Cross-motion for Judgment on the Administrative Record.

<h2 style="text-align:center"><u>CONCLUSION</u></h2>

---

[56] A.R. at 367.

[57] A.R. at 395, 399-400, 633-34.

Because the eligibility requirements for short-term disability and long-term disability under the plan UOO provided to Hollis & Burns employees were identical, the Court finds UOO's denial of both long- and short-term disability benefits properly before it. However, because UOO's denial of short-term benefits was not arbitrary and capricious, the Court **DENIES** May's Motion for Judgment on the Administrative Record, **GRANTS** UOO's Cross-motion for Judgment on the Administrative Record, and **DISMISSES** May's claim against UOO under ERISA.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date:  May 31, 2013.